# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

J&J Sports Productions, Inc.,

     Plaintiff

v.

Coco Beach Corporation d/b/a Coco Beach
Sea Food and Mexican Restaurant and
Delfino Gomez, individually,

     Defendant

Case No.: 2:17-cv-01855-JAD-BNW

**Order Denying Cross-motions for
Summary Judgment**

[ECF Nos. 30, 33]

J&J Sports Productions, Inc. brings this signal-piracy action against defendants Delfino
Gomez and Coco Beach Corporation d/b/a Coco Beach Sea Food and Mexican Restaurant for
broadcasting a boxing match without paying J&J Sports a licensing fee. J&J Sports now moves
for summary judgment on Gomez's vicarious liability as Coco Beach's corporate owner. J&J
Sports had to demonstrate that there was no genuine issue of material fact as to whether Gomez
could supervise and stood to gain from the unauthorized broadcast. Gomez has provided
evidence to dispute that he was the owner of the restaurant on the day of the fight. Because this
same evidence creates a genuine issue of fact as to Gomez's ability to supervise or financially
gain from the unauthorized broadcast, I deny summary judgment for either side and refer the
parties to a settlement conference with the magistrate judge.

## Background

J&J Sports Productions, Inc. is a closed-circuit distributor of sports and entertainment
programming that obtained exclusive, nationwide broadcasting rights for a boxing match
program on July 12, 2014, that featured Saul Canelo Alvarez versus Erislandy Lara, several

undercard bouts, and commentary.[1]  It sublicensed the broadcasting rights to customers across the country.  To combat signal piracy, J&J Sports also collaborated with law enforcement and private auditors to crosscheck suspected pirates against a confidential list of paying customers.[2]

On the day of the program, auditor Skye Campbell observed the eleventh round of an undercard bout at defendant Coco Beach Corporation d/b/a Coco Beach Sea Food and Mexican Restaurant, which had not paid a sublicense fee to broadcast the program.[3]  Campbell counted 14 people inside Coco Beach and 2 television monitors displaying the fight.[4]  She also counted about 17 posters advertising the fight in and around the establishment, and learned that Coco Beach was charging patrons a $10 cover charge.[5]  There was also a sign outside the establishment that read: Grand Opening Under New Management.[6]

Gomez contends that he sold Coco Beach to Jose Manuel Rosas Ortega about two months before the broadcast.[7]  A purchase sale agreement indicates that Ortega paid a non-refundable $20,000 deposit in February 2014 and that the agreement would be finalized after Ortega paid the $10,000 balance in two $5,000 installments in April and May 2014.[8]  The agreement also provides that Gomez would remain the "responsible party for all matters related [to] the

---

[1] ECF No. 30-1 at 8–13.

[2] *Id.* at 2.

[3] ECF No. 30-2 at 4–6.

[4] *Id.*

[5] *Id.* at 5–6, 8, 10.

[6] *Id.* at 10.

[7] ECF No. 31 at 11.

[8] *Id.*

restaurant" until 100% of the business was transferred to Ortega.[9]  The agreement is signed and notarized on the second page.[10]

Gomez attests that Ortega took control of the business in February after paying the $20,000 deposit, but that Gomez remained responsible for paying all sales, employment, and federal income tax until Ortega paid the second installment that May.[11]  Ortega allegedly told Gomez that "licensing was being done as far as the transfer of the business."[12]  But that August, Ortega informed Gomez that he had not yet applied for a business license, nor had he updated the registration with the Nevada Secretary of State or transferred any of the utility bills, vendor services, or taxes into his name.  Gomez understood this to be a breach of the agreement.[13]

Nonetheless, Ortega wanted to sell the restaurant to Maria Quintero de Ramirez, so he asked Gomez to sign the purchase agreement for that sale because the business was still in Gomez's name.  Gomez agreed to sign the agreement (and amended agreement) with the understanding that Ramirez would take his "name off of the corporation and immediately apply for a business license," "transfer all of the billing out of [his] name," and reimburse him.[14]  Gomez adds that he signed the sale agreement as the owner of the corporation while listing Ramirez as the seller, but didn't receive any profits from the sale other than the reimbursement for the business expenses.[15]  The amended agreement's signature line shows that Ramirez was

---

[9] *Id.*

[10] *Id.* at 12.

[11] *Id.* at 14.

[12] *Id.*

[13] *Id.* at 15.

[14] *Id.* at 15–16.

[15] *Id.* at 16, 24.

not the seller but only a witness.[16]  And the body of both agreements list Gomez as the "solo [o]wner," omitting any reference to Ortega.[17]

On July 6, 2017, J&J Sports filed its complaint against Delfino Gomez as the owner and corporate officer of Coco Beach Corporation d/b/a Coco Beach Sea Food and Mexican Restaurant, and against the restaurant itself, asserting causes of action for violations of section 605 of the Federal Communications Act of 1934, as amended (47 U.S.C. §605) and section 553 of the Federal Cable Communications Policy Act of 1992, as amended (47 U.S.C. §553).[18]  J&J Sports moves for summary judgment against Gomez, arguing that he is undisputedly liable under § 605 because publicly available documents establish that he was the owner of the restaurant on the day of the broadcast, so he either supervised the violation or had a financial interest in it.[19] Gomez responds that he can't be liable because he sold the corporation months before the broadcast,[20] and he countermoves for summary judgment in his favor.[21]

---

[16] *Id.* at 28.

[17] *Compare id.* at 22–23 *with id.* at 26–27.

[18] ECF No. 1.

[19] ECF No. 30; ECF No. 30-2 at 19 (minutes of the corporation); *id.* at 12–17 (business sale agreement and amended sale agreement).

[20] ECF No. 31.

[21] *Id.*; ECF No. 33.  J&J Sports challenges Gomez's countermotion as untimely, arguing that the magistrate judge's scheduling order made dispositive motions due October 19, 2018.  ECF No. 34 at 13–28.  There are no new arguments in Gomez's countermotion that he does not raise in his response.  *See* ECF Nos. 33 and 31.  And J&J Sports does not argue that it was prejudiced by the motion.  ECF No. 34 at 1–2.  Moreover, J&J Sports stated that it would be filing its official opposition to Gomez's countermotion, and it remains unopposed, further belying any claim of prejudice.  *Id.* at 2.

# Discussion

## A. Standards for cross-motions for summary judgment

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[22] The moving party bears the initial responsibility of presenting the basis for its motion and identifying the portions of the record or affidavits that demonstrate the absence of a genuine issue of material fact.[23] If the moving party satisfies its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show a genuine issue for trial.[24]

Who bears the burden of proof on the factual issue in question is critical. When the party moving for summary judgment would bear the burden of proof at trial (typically the plaintiff), "it must come forward with evidence [that] would entitle it to a directed verdict if the evidence went uncontroverted at trial."[25] Once the moving party establishes the absence of a genuine issue of fact on each issue material to its case, "the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense."[26] When instead the opposing party would have the burden of proof on a dispositive issue at trial, the moving party (typically the defendant) doesn't have to produce evidence to negate the opponent's claim; it merely has to point out the evidence that shows an absence of a genuine material factual

---

[22] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[23] *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

[24] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes,* 67 F.3d 816, 819 (9th Cir. 1995).

[25] *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) (citation and quotations omitted)).

[26] *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (citation omitted).

issue.[27]  The movant need only defeat one element of the claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[28]  "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them."[29]

**B.     Whether Gomez can be individually liable for violating section 605 of the Federal Communications Act is a genuine issue of material fact.**

The Federal Communications Act[30] (FCA) provides a private right of action for signal piracy against any person who intercepts and broadcasts a television signal and uses it for his personal benefit or that of another without the sender's authorization.[31]  To establish liability for a signal-piracy claim, the plaintiff must show that it "had proprietary rights in the intercepted communication"[32] and that the defendant unlawfully intercepted and broadcasted the communication.[33]  The FCA is a strict liability statute, so proof that the defendant intended to

---

[27] *See, e.g., Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 885 (1990); *Celotex*, 477 U.S. at 323–24.

[28] *Celotex*, 477 U.S. at 322.

[29] *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two,* 249 F.3d 1132, 1134 (9th Cir. 2001)).

[30] 47 U.S.C. § 605(a).

[31] *DirecTV, Inc. v. Webb*, 545 F.3d 837, 844 (9th Cir. 2008) ("[S]ince the 1984 amendments[,] the 'communications' protected by § 605(a) include satellite television signals.").

[32] 47 U.S.C. § 605(d)(6) (defining "person aggrieved" as "any person with proprietary rights in the intercepted communication by wire or radio, including wholesale or retail distributors of satellite cable programming, and, in the case of a violation of paragraph (4) of subsection (e), shall also include any person engaged in the lawful manufacture, distribution, or sale of equipment necessary to authorize or receive satellite cable programming").

[33] *Id*. at § 605(a).

pirate the signal is not necessary.[34]  And an aggrieved party may bring an action against a signal pirate under either statute, but the pirate "cannot violate both by a single act of interception."[35]

J&J Sports seeks to hold Gomez vicariously liable as Coco Beach's owner.[36]  To hold a corporate officer vicariously liable for a FCA violation committed by the corporation, the plaintiff must show that the corporate officer had the ability to supervise the violation and had a direct financial interest in the violation.[37]  Courts have found corporate officers vicariously liable based on secretary of state and business licensing records confirming that the individual is an officer of the offending corporation.[38]

J&J Sports argues that Gomez is liable because, at the time of the unlawful broadcast, Gomez's name appeared on the Nevada Secretary of State registration documents and Gomez "self-identified as [sic] as the president and solo owner of the Coco Beach Corporation."[39]  But it failed to provide supporting evidence.  Instead, J&J Sports relies on a business-sale agreement

---

[34] *See id.* § 605(e)(3)(C)(iii) (providing a reduction in damages where "the violator was not aware and had no reason to believe his acts constituted a violation"); *see also J & J Sports Prods., Inc. v. Delgado*, 2012 WL 371630, at *3 (E.D. Cal. Feb. 3, 2012) ("Both § 553 and § 605 are strict liability statutes.").

[35] *Delgado*, 2012 WL 371630, at *3 ("A signal pirate violates section 553 if he intercepts a cable signal, he violates section 605 if he intercepts a satellite broadcast. But he cannot violate both by a single act of interception.") (quoting *J & J Sports Prods., Inc. v. Manzano*, 2008 WL 4542962, at *2 (N.D.Cal. Sept. 29, 2008)).

[36] ECF No. 30 at 13–14.

[37] *J&J Sports Production, Inc. v. Flores*, 913 F. Supp.2d 950, 955 (E.D. Cal. 2012).

[38] *G&G Closed Circuit Events, LLC v. Contreras Valencia*, 2019 WL 2524912, at *4 (S.D. Cal. June 19, 2019) (holding that defendant corporate officer was vicariously liable under § 604 based on the secretary of state's registration and liquor license); *J & J Sports Prods., Inc. v. De La Cerda*, 2013 WL 5670877, at *5–6 (E.D. Cal. Oct. 16, 2013) (same, based on documents that show defendant was an officer and registered agent).

[39] ECF No. 30 at 13.

between Gomez and Ramirez for the sale of the corporation that is dated August 20, 2014,[40] the

amended agreement that was signed the next day,[41] a receipt of final payment that confirms the

sale,[42] and "Minutes of the Corporation" that announce the sale will be effective on September 1,

2014.[43]  To dispute his ownership, and thus his liability, Gomez supplies a business-sale

agreement for the sale of the same corporation that he executed with Ortega on February 27,

2014, and which provides that the sale would become final that May.[44]  Gomez also provides an

affidavit in which he attests that Ortega "immediately took over the entire business" that

February but never changed the registration records or obtained a business license in his name in

the three months before Ortega sold the corporation to Ramirez.[45]  Gomez maintains, that despite

his name appearing on the agreement selling to Ramirez, it was Ortega who owned the

---

[40] ECF  No. 30-2 at 12–14.

[41] *Id*. at 15–18.

[42] *Id*. at 18.

[43] *Id*. at 19.

[44] ECF No. 31 at 11–12.  J&J Sports also raises a number of objections to challenge Gomez's evidence, claiming that his statements in the affidavit are hearsay or lack of foundation, or that the business records are not authenticated. ECF No. 34-1.  But J&J misstates the standard that applies to evidence submitted in support of a motion for summary judgment.  The 2010 amendment to Rule 56 "eliminate[d] the unequivocal requirement" that evidence must be admissible in its present form to be considered at summary judgment.  *Romero v. Nev. Dep't of Corr.*, 673 F. App'x 641, 644 (9th Cir. 2016) (unpublished).  Instead, the rule mandates that the substance of the proffered evidence be admissible at trial.  *Id.*; *see also* Fed. R. Civ. P. 56 advisory comm. note to 2010 amendment.  Gomez provides his affidavit, which explains his prior sale to Ortega and why his name appears on the second set of sale agreements to Ramirez, copies of the agreements themselves, and billing records to show the expenses Ortega owed him and which Ramirez agreed to reimburse Gomez.  ECF No. 31 at 13–28.  All three of the sale agreements—one selling to Ortega and two selling to Ramirez—state that Gomez is the owner of Coco Beach, but the latter agreements conflict with the sale to Ortega.  It is this conflict that gives rise to a genuine issue of fact as to who was the owner of Coco Beach during the broadcast.

[45] ECF No. 31 at 14–15.

corporation on the day of the broadcast.[46]  He also swears that he had no financial interest in the corporation, having sold it six months earlier, and only received a reimbursement for business expenses that Ortega failed to pay him.[47]  This evidence creates a triable issue of fact as to Gomez's liability because, assuming without deciding that the first sale to Ortega is the controlling one, Gomez remained liable for the business registration and related expenses,[48] thus demonstrating his financial interest in the corporation's unauthorized broadcast despite Ortega having "100% of the Business."[49]

### Conclusion

Neither party has established it is entitled to summary judgment.  The conflicting business-sale evidence raises a genuine issue of material fact about whether Gomez can be individually liable for this violation because it is not clear whether he owned Coco Beach on the day of the unauthorized broadcast.  So I deny the cross-motions for summary judgment and refer this case to the magistrate judge for a settlement conference.

Accordingly, IT IS HEREBY ORDERED that the parties' cross-motions for summary judgment **[ECF Nos. 30, 33] are DENIED.**

IT IS FURTHER ORDERED that this case is referred to the magistrate judge for a mandatory settlement conference.

Dated: September 28, 2019

_____
U.S. District Judge Jennifer A. Dorsey

---

[46] *Id*. at 15–16.

[47] *Id*. at 16.

[48] *See id.* at 19–20 (invoice from Gomez to Ortega's alleged bookkeeper, Carlos, seeking reimbursement for insurance, corporation fee, license, and utilities).

[49] *Id*. at 15; ECF No. 34-1.